Our next case this morning is No. 22, 1929, Darby Development Company, Inc. v. United States. May it please the Court, appellants here are owners of residential properties, often mom and pop operations. They have to invest heavily in maintenance of the properties, they have to pay taxes, they have to pay utilities, perhaps debt service. They incur substantial expenses. At the onset of the COVID-19 crisis, undeniably a serious health emergency, the CDC issued an order preventing these owners from evicting persons who were former tenants but are no longer tenants. Can I ask you a question about just the history of this? This may not be germane to some of the substantive legal issues. But when all of this happened, money was authorized and appropriated. I think we're up to almost $50 billion for this purpose. So at the time, and even what your friends, the amicus quote, President Biden is saying, like, well, let's just get this money out. What happened to the money? Because it seems like Congress, whatever Congress contemplated and the executive branch contemplated, it was, we're going to keep these renters in their homes and we're going to provide them money so that they can cover their rental expenses. That would have avoided the taking because your clients would have been compensated. What happened to the money? That's a great question, Your Honor, and I wish I had an answer for you. I think in some cases, some of that money may have gone to some apartment owners, in which case we would have a damages issue to the extent that any of it went there. But much of it did not, you know, this was, that was enacted late in the game. And so many of these renters who are former renters who are now living rent free, the money may have been out there, but they were under no compulsion to go and take advantage of those funds and often didn't. But did you agree that everyone involved in this program contemplated that this eviction moratorium would not result in a taking or whatever you want to call it because Congress is appropriating money to cover the rental expenses of those tenants that were not evicted and were unable to pay rent? No, Your Honor, I disagree with that because what the government could have done to avoid this problem was say that we're allocating $50 billion or whatever we're going to allocate and pay that to the landlords to make sure that they are compensated. But if they're paying it to, I don't want to spend too much time on this, but giving it to the renters for the purpose of covering their rental expenses, yeah, you're right. It could have been avoided maybe some of the, you know, interim steps, but that was the same purpose, whether they gave it to the renters or the landlords. It was for purpose of covering their rental expenses if they were unable to pay them, right? Well, only if it was effective though for the purposes of the take. Right. Okay. Sorry. Go ahead. Okay. So, we have these Supreme Court cases and we have our cases, which says that for a state of takings claim, you have to assume authorization and that if the government action is unauthorized, that is a ground for enjoining the action, but not for a taking. And I'm having difficulty fitting this situation in an authorization context because the Supreme Court has said that the order was unauthorized. Right. Actually, this court's opinion in Del Rio and the Supreme Court's decision in Alabama Association of Realtors answers that question. In Del Rio, the court said, look, when we talk about unauthorized, we're not talking about is it explicit in the statute. We're talking about something different for purposes of taking. Okay. But your problem is that the Supreme Court cases say it has to be authorized. In the Rith Energy case, Judge Bryson, who wrote the Del Rio opinion, said explicitly that it requires, the takings claim requires authorization. And there are many cases where a takings claim has been rejected on the ground that the action wasn't authorized, including the Hogue case, North American Transportation in the Supreme Court, and NBH Land, Tab Lake, Southern California, Lion Raisins, and Washington Federal in our court or the predecessor court. What case holds that if there's a lack of authorization under the basic statute that you can nonetheless state the takings claim? In fact, that is what Del Rio says. And Hogue, for example, doesn't say anything different. There, there is explicit limit. But Del Rio did not involve a situation of lack of authorization in the statute. It involved a situation where the government, by contract, had already agreed to access to the land. I'm asking which case finds a lack of authorization and still says there's a takings claim. Okay. Again, lack of authorization is a question that depends on the individual circumstances. So you have, in Del Rio, it wasn't just that they had the land. The question was, was it authorized for the Interior Department to say, well, you have to go get an easement from the tribal nation. And then it was determined, no, that's a misreading of the statute. So it was... No, it's not a misreading of the statute. It's that that ruling was contrary to the contract that they entered into. And so Del Rio says that when you're looking at this, absent a congressional declination, so if Congress specifically says, as in the tobacco cases, if Congress says you shall not do this and you do it, you know, then clearly not authorized. But otherwise, if it's within the general purposes, then it doesn't require there to be a statute that says you can do exactly this. And in fact, there... Are you saying you're relying on Ramirez for this distinction? No, I'm sorry. I may have misfocused. Del Rio. And then following that, if you look at the Court of Federal Claim Decisions in Board Machine in Laguna Catuna, they both read Del Rio exactly that same way. Because you have in Laguna Catuna the exact situation we have here, is that the Supreme Court, in another case, intervenes and says, oh, migratory... The mere presence of migratory birds doesn't make something a water of the United States under the Clean Water Act, and therefore the EPA did not have any statutory authority to prevent the discharge of the oil and gas fluids onto this dry lake bed. Nonetheless, the Court says, yeah, but it's within the EPA's scope to determine these things, and cites Del Rio and says that's exactly what they're doing. Those are Court of Federal Claims Decisions. Correct. You're familiar with RIF's energy? I'm not. You're not? Well, you should read it, because it goes on to explain what Del Rio said, and it says as long as the government's action was authorized, even if the government's action was subject to a legal challenge on some other ground, we explain that unconstitutional taking lies. But it also goes on to say explicitly, Del Rio does not give the plaintiff a right to take this claim rather than a congressionally mandated administrative proceeding. RIF is thus required to litigate its taking claims on the assumption that the administrative action was both authorized and lawful. You are not assuming that the action here was authorized. You couldn't, because the Supreme Court said it wasn't. The difference is that there was a statute, and the statute authorizes the Department of Health and Human Services to enact such regulations as are necessary to prevent the spread of communicable diseases. Yeah, I know, but you lost that in Alabama. Correct. I think, is it fair to say that your position here rests on the interpretation of authorization in the context of a takings claim? That is fair. And that there's language in Del Rio that talks about the scope of authority, and I say, what conduct action is chargeable to the government when it is a good faith implementation of the statute? And is that what you're kind of relying on here for the purpose of authorization? Absolutely, because it was clearly a good faith interpretation of the statute. The government, which has now taken a different position, for a year said it is a good faith implementation of the statute. The President of the United States directed CDC, through an executive order, to take this action. CDC takes the action. Congress then extends it and says, yeah, you've taken this action. We want to continue this. So even though ultimately the Supreme Court says, you know, we disagree that the specific part of the Public Health Act, I think it was Section 361, we disagree that that gives you that amount of authority for the purpose of a takings claim, it in no way says that that is not governmental action. How is that consistent with all the cases that I cited to you, where the Supreme Court and our predecessor court has said repeatedly, because it was not authorized, there's no takings claim? It doesn't say that there's a good faith standard. With energy, it doesn't say there's a good faith standard. Well, that's very much what Del Rio says. Well, but that's a stray comment in there, which is explained in with energy is not changing the rule articulated by the Supreme Court in the prior cases that authorizations are required. Well, I don't take it one further. We have all these cases which say, no taking, because no authorization. You agree an authorization is required, right? Yes. If, for instance, an authorization in the sense of a takings claim, which is not a dictionary definition of authorization, so if the Forest Service came in and did this, clearly not authorized. Okay? But we have the agency that Congress authorizes to deal with public health emergencies. They are authorized. They are doing this pursuant to a presidential directive to doing that. The fact that down the line, somebody comes in and says, you know what, we're going to read this differently. Keep in mind that the D.C. Circuit and the District Court had different readings. The D.C. Circuit said, no, we think it is fully authorized. The key here is the government cannot, the whole purpose of this part of takings jurisprudence is to say, look, if government goes and somebody clearly is not authorized, and I think that the Supreme Court said that the CDC was clearly not authorized. Well, the Supreme Court, actually, and Alabama Association of Realtors went on and said that preventing the landlord from evicting tenants who breach their leases intrudes. That they said it's clearly not authorized. They regard the CDC interpretation of the statute as odd and inconsistent with the fundamental purposes of the statute. They did, but then they went on and said, but by the way, what you're doing here is a taking. And isn't, I mean, I think in your brief, you relied to a certain extent on Supreme Court's opinions in Great Falls and in Cosby, which also arguably involved action that was ultimately found to have not been authorized, but was nonetheless concluded to have been a taking. Exactly, Your Honor, because it says, look, if you're painting outside, you are found subsequently to have painted outside the lines. You had a good faith basis for doing this or it was within the scope of your general duties, and clearly the CDC is within its general scope to try to protect the public health through such measures. Even if subsequently someone says, you know what, you went too far. That's not, you know, you went an extra step, as in Great Falls, you only had a certain footprint across the Potomac. In Great Falls, there was nothing in the statute defining the scope of the survey. It was just because ultimately some other official did a survey, which didn't include this thing. And the Supreme Court said in Great Falls, well, this is within the purposes of the statute, and therefore it's a taking. But it doesn't stand for the proposition that a lack of authorization situation can involve a taking, because it said specifically it is authorized by the statute. Right, and again, my argument is for takings purposes, Supreme Court and Alabama Association of Realtors doesn't say for takings purposes that the statute is not authorized. It says, we think you went too far, and you don't have this basis. That's no different from the Supreme Court saying, you know, you don't have authority under the Clean Water Act, merely because you found migratory birds in the lake bed to prevent a discharge. The same thing applies. Just as the EPA there had the authority to do this, the fact that the Supreme Court later said, no, you read that wrong. Same thing here. Just because the Supreme Court says, no, CDC and Health and Human Services, you read this too broadly, doesn't mean for the purposes of taking law that they were not authorized to take these actions. I was going to ask you, for purposes of takings law, is there any scenario or any cases that you know of that involve a scenario like this one where there was, you know, the agency takes some action, and then there's some action taken by Congress also, maybe in support of the agency's action? I mean, what cases do you think are best for showing that that would mean, perhaps, authorization under takings law? Yeah, and I'm sorry, I don't have one off the top of my head that says, you know, this is, you know, we are now. Maybe there's no facts quite like this one. Yeah, I mean, it is pretty unique. I mean, clearly if Congress comes in and says, you know, we totally reject what you're doing, that's one thing. But here Congress did something else. They said, you've done this, we cite it, we want to continue it, you know. I just didn't see anything in the cases that the parties were citing that involved congressional action also. No, I think you're right. I mean, if there is one, I'm just not aware of it, Your Honor, which is possible. But I don't see that. But this is a fairly unique case. But keep in mind what's going on. All the case law is talking about what would, you know, does the agency, is it doing something that is within its general scope? Clearly HHS and CDC is here. That's just not true. All the cases that I cited to you are situations in which they construed the authorizing statute and said there's no taking because it's outside the scope of the statute. But respectfully, Your Honor, a case like Hull, for example, there it's specifically cabined and Congress says we're only going to allocate whatever it was, $4,500 or something for the building. And so it's clear, and in fact communicated directly with the landlord. I mean, here's Congress talking with his landlord at the turn of the century and says we're only going to pay so much and we're not taking the basement. And the fact that, you know, then they occupy the basement, that was clear from the start. But here you have a congressional act that specifically says that HHS is authorized to take such measures as are reasonably necessary to spread the communication and spread of communicable disease. The fact that the next sentence then talks about fumigation, et cetera, the Supreme Court subsequently says, no, we think that that second sentence controls. But in terms of authorization for takings purposes, they plainly met that standard. And Congress came in and if they, you know, they certainly acquiesced in it if they didn't ratify it. I mean, Congress could have said no, but they didn't, they said yes. And the court, I think Justice Scalia said this in Ramirez. I mean, he cited Hull for saying in that case there was a specific limitation on the agent's authority, which they transgressed, and that's different in this case. Absolutely. In all the cases, if there's something, for instance, the cigarette cases, I mean, Congress specifically said the FDA can't regulate cigarettes. But that's just not true. I mean, there are half a dozen cases where they said no taking because no authorization. And those are not cases in which there was a specific congressional statute contradicting. That's just not the case. Respectfully, I don't think there's a congressional statute here contradicting what they did. No, no, but I'm saying the cases don't require contradicting. Maybe you can read how that way. I don't think so, but maybe you can. But there are all these other cases that have said there's no takings liability because there's no authorization. They're cited in the government's brief. And I just don't understand. Now, again, that's a court of federal claims case. No, no, no. I understand. But the clear reading of that is because the court there says were it not for Congress specifically saying the FDA doesn't have authority, it would have been authorized. I'm not talking about the FDA case. I read you the list of cases. Those are not the FDA cases. Each of those cases said specifically lack of authorization, no taking. I would agree with that, Your Honor. But the point is, our view is, that begs the question, what is for taking purposes authorization? And, in fact, in Alabama. The cases said there was nothing in the authorizing statute that permitted this. Del Rio goes on and doesn't limit it to does the authorizing statute specifically say that. It goes on and says is it within, you know, good faith interpretation. Clearly there's a good faith interpretation here. Is it within the general scope? That is the body of case law. Del Rio also sort of juxtaposes ultraviolence as being the exception where it's not. And so why isn't this case under the ultraviolence rule? Because ultraviolence, again, is where someone, you know, again, in the board machine case, the example was if the Federal Communications Commission went out and tried to regulate airlines, clearly that's outside their scope. Similarly, here, if somebody from the fisheries department goes out and closes down, you know, whatever, or says you can't rent to someone, that's clearly ultraviolence. But when you have the CDC, which is charged with doing this specific type of control of communicable diseases, you've got the President saying you need to do it, you've got Congress saying we're all on board with this, and citing to the public section 361 of the Public Health Act, which says that you can take actions necessary to spread those, you are for, that is definitely not ultraviolence. Here, your problem is that the Supreme Court, in the city of Arlington case, said specifically that an agency action is ultraviolence if it's not within the scope of the authorizing statute. It said that explicitly. The issue is, Your Honor, with all respect, if you look at takings laws that evolved, and we can go back and look at cases from the early 20th century or whatever, and there was a much narrower view of takings law. As takings law has evolved. The Arlington case is not a 19th century or 20th century case. It is 2013, and it says specifically that an agency action is ultraviolence if it's not authorized by the statute. Right, and again, I think it becomes a little bit circular, because the statute here does authorize the CDC to take these measures, and Congress comes along and says we agree and we want to keep doing it. The fact that the Supreme Court subsequently said our view is that the second sentence doesn't allow you to do this, just that that is different. In fact, the Supreme Court in Alabama Association of Realtors goes on and it says, what is happening here is that despite the CDC's determination that landlords should bear a significant financial cost of the pandemic, many landlords have modest means, and preventing them from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership, the right to exclude. So to read Alabama Association of Realtors as saying lack of authorization for takings purposes is entirely inconsistent with that language from that opinion that I just read. The court made it clear, as a matter of fact, that this is a taking and signaled where this is going. But the fact that it ultimately said that for the purposes of the injunction, that it thought that the government had gone too far, in no way speaks to the takings aspect of authorization. When you say it signaled where this was going with takings, is that based just on the language you just read? It is. Okay. Your Honor. All right. All right, I think we're out of time. I think so. We'll give you a couple minutes for rebuttal. I appreciate it. Thank you, Your Honor. Thank you, Your Honor. And may it please the court, it's well established in takings law that for the government to be liable for a taking, the government action at issue must be duly authorized by Congress. Alabama Association of Realtors conclusively held that there was no authorization for the eviction warrant. Can I just, I'm sorry to interrupt, but can I just start you where I started your friend? Because I just can't resist it because I really am perplexed. Sure. Why we're here and how we're here. Because when this program was in effect, irrespective of the authorization of CDC, we had Congress appropriate almost $50 billion. And it's my understanding, reading the language in the two congressional actions, that it was appropriating this money, not authorizing, appropriating money, 50 billion, to give to rent, and allow state and local governments to give to renters so that they could pay their rent. And we wouldn't be here if that had happened. So why did that not happen? Well, I think there's several different points to that. One, I mean, that program was administered by Treasury. That money has been allocated out. I think it's approximately $47 billion. But I'm not sure you say we wouldn't be here. I mean, this is plaintiff's complaint here. What I meant was maybe, I mean, that if it had been given to the renters, if the money had been used as intended by Congress in a timely fashion, then the renters would have had the money to pay the rent, and the landlords wouldn't have been deprived of their rental money even through this eviction. Wasn't that the point of the appropriations? The point of the appropriations certainly was to help individuals who were behind on their rent. But I think there's a lot of different issues at play with respect to that. I mean, that may be the ultimate, you know, if setting aside our arguments on authorization and our arguments with respect to a per se taking, whether or not a plaintiff can even show that they didn't go and use the government program. Do you know where the money is? I mean, is there some money the Treasury still has? Has it all been allocated? We cited in our brief the citation to Treasury's program and the allocation of the money. The last time I looked, it's all been allocated out. I mean, it's going to the states, and the states have their own programs to get the money out. I mean, I don't know specifically whether each and every state has, you know, allocated its money, but I think to some extent that's besides the point. I'm sorry, I just can't resist having spent a month looking at this case. Sure, I think it probably exemplifies, as far as the merits of a takings claim, that there may not be much of a cognizable takings claim setting aside those issues. But back to the authorization point, plaintiffs' argument is contrary to Supreme Court precedent. Well, let me ask you about that, because Judge Dyke called out a number of cases, but at least two of them, as I heard them, were the Rith Energy line of cases and also the city of Arlington. And I didn't see, maybe I missed it, the government reliance on the city of Arlington, and I know they cited Rith, but you cited Rith to say the rule there is not implicated here. You cited Rith in a footnote on page 25 of your brief. Well, I didn't mean to suggest that the city of Arlington case dealt with this issue. I apologize. What the city of Arlington case says is that if the agency acts beyond its authority, it's acting ultra-violence. Respectfully, Your Honor, for example, we cited the Youngstown Sheet and Tube case. So that's a very analogous case to what happened here. The Supreme Court looked at the government action there, President Truman directing the Department of Commerce to seize the various steel mills, and it went through whether or not there was authorization there, and it looked at various statutes, it looked at President's power. But wait, am I just remembering, didn't Youngstown, didn't the Supreme Court decide Youngstown on the constitutional issue and not reach this issue? It reached the issue, and it's not dicta, because if you look at the briefings in that case, the solicitor's office specifically made the argument that there would be a takings remedy even if there was no authorization in that case. And the Supreme Court rejected that, and it cited the Hoey case, it cited North American transportation as well. And so that case is a very analogous case to here because in— The argument was don't enjoin the President from doing this because there's a takings remedy. Right. And the Supreme Court says there's no takings remedy. Right. The government's argument was there's a backstop here. So you don't have to enjoin President Truman's action here. And in fact, in the briefing, the government actually represented that it would not raise the authorization issue in a lawsuit in the Court of Federal Claims. The Supreme Court rejected that. And that's Supreme Court precedent, and Del Rio can't contravene cases like Youngstown or Hoey. And with respect to Hoey, on the take, there's two issues in that case. One's an implied in fact contract issue. One is the taking issue. With respect to the takings issue, the Supreme Court doesn't mention anything about this limit on Congress. It specifically points to the fact that there's no authorization, express or implied. And that's the standard in the line of cases going all the way back that's gone forward to Youngstown and is still the standard today. So this court can't contravene that precedent on the authority issue. Once there's a lack of authority, as the Supreme Court held in Alabama Association of Realtors, that's the end of the story. It's outside the scope of the… In your view, was the CDC attempting a good faith implementation of the Public Health Services Act? I mean, they were acting in good faith, but that's… When Del Rio uses that term, there still must be authority for the specific action at issue. That always has to be the case. It's not just a general good faith standard. And what Del Rio was really getting to is the situation where there is statutory authority. There's the authority to act, the power to act, but for some reason, and we cited to this in our brief and cited to the Tabs Lake case, for example, there was like a procedural issue with the implementation of that. And that's similar to Del Rio, what was happening with Del Rio, that it violated the contract. But in Del Rio, the Department of Interior had the power to issue permits. It had the power to regulate specific mining at issue. Here, the Supreme Court flatly rejected that the CDC had the power to issue the eviction moratorium. And it did it in no… I mean, the clarity of the words are striking. They said it's strange credulity, the government's interpretation of the statute. It mentioned that the interpretation, that the use of the statute was unprecedented. It said it was, you know, I mean, I could keep mentioning language from that case, but there's absolutely no daylight from the Supreme Court's decision in Alabama Association of Realtors in a finding of lack of authority for any purpose, for takings purposes as well as… And what do you make of the sentence that your friend called out a couple times from Alabama? Well, the sentence from Alabama is a statement without any briefing at all. If you go back and look at the briefing in that case, there was no takings claim raised at all in Alabama Association. And we're talking about one citation to Loretto where the prior sentence even indicates, I think the sentence states that there's no guarantee that these plaintiffs would receive compensation. But again, I mean, that's just… I'm sorry, I couldn't catch that. They cited to Loretto and now you're citing Loretto? No, I'm saying in the sentence in Alabama Association prior to that Loretto citation, the Supreme Court stated that there's no guarantee these individuals receive compensation. But again, that issue is just not briefed at all. And again, if it was briefed, there would certainly be the issues of authority. And they weren't addressing, if we were to get to our next argument, they weren't addressing the yee line of cases there. But again, that was also in the context of irreparable harm. The merits of the case was the authority issue. And let me add that in West Virginia versus EPA, contrary to what plaintiff's counsel has said about the Alabama Association decision was not a final order or whatnot, the Supreme Court has cited Alabama Association on the authority issue as a holding for cases on the merits. What about Cosby and Great Falls? You touched on it a little, but I guess I wasn't clear on why this isn't involving the same type of exceeding authority that you are. Well, because I'll address Great Falls first. So in Great Falls, what Congress, the actual statuette issue there that provided the authority was saying, you can go and seize by eminent domain land for a dam. And that's what happened. And the only issue there was really an issue of this map in notice. The map that was created was essentially slightly inaccurate. And this was back in the 1800s. It was slightly inaccurate. The map wasn't part of the statute. Exactly, Your Honor. The map wasn't part of the statute. The authorizing statute was to go out and seize by eminent domain land for a dam. And they complied with that. It just so happens. I mean, we could call it a procedural infirmity, a problem with the implementation in some sort. But that's just not anywhere close to what we have when you're looking at the situation here, where the Supreme Court held as a matter of power the ability to act that the CDC could not go for with respect to the eviction moratorium. Cosby is similar on that point. Because, I mean, one initial point on Cosby here is the government never actually raised an authority issue in that case. And, in fact, one of the issues it raised was a lack of authority. One of the issues that it raised was essentially the government has control over the airspace. And that's why one of the reasons essentially why there couldn't be a property interest there for plaintiffs. But that was the case about the government having exceeded its authority on where the flights could be. But the statute that even in that decision it's focusing on is the ability of that aviation administration, the aviation authority, to implement, to essentially issue glide paths for airplanes. That is the core authority that in Cosby they were focusing on. And it just so happens it violated a different statute. But that's, I mean, one, if you read Cosby, there's hardly any discussion of this issue. And, if anything, there's really just silence. I mean, it's not, it doesn't mention any of the cases we're talking about because it just doesn't address that issue. And a big part of that was it wasn't presented to the Supreme Court. Unlike, for example, in Youngstown, Sheet and Tube, where that issue was front and center because both parties presented that to the Supreme Court. And so I don't think, and I don't believe Cosby's even cited in Del Rio. So I don't even think if we were somehow going back to Del Rio that the Del Rio court was finding Cosby to be, you know, a decision that really moves the needle. But again, those are easily distinguishable from the situations here where the Supreme Court clearly held that the CDC did not have the authority to issue the eviction moratorium. And because an essential element of all takings claim is authority, there can be no takings claim here. And I'm happy to, you know, we also raised an issue with respect to the physical taking line of cases with respect to E. I'm happy to answer any questions about that because I see my time is almost up. Or the illegal exaction issue as well. We don't think that either of those, the E, we think the E controls that issue with respect to whether there's a physical taking. And not Cedar Point. With respect to the legal exaction issue, we think this court's precedent. So you need E to be about eviction, cover eviction, and not just rent control. Because the other element of the issue is rent control, right? Well, I disagree with that because a big part of the claim in E, in fact, was the issue of plaintiffs were on the property. And it's the rent control statute in conjunction with California's, you know, the eviction statute as well. Those plaintiffs, they wanted to evict individuals off their property. And they weren't able to do so. And the Supreme Court said that in that situation where there's been an initial invitation for tenants to go onto the property, it has to be viewed through the lens of Penn Central. And Cedar Point does not change that because the union organizers in Cedar Point were strangers. And that's the key difference. And numerous district courts have picked up on that and used that as the rationale. We addressed the one decision from the Eighth Circuit which reached a different conclusion. But as the dissent in the rehearing on Bonk stated in that case, that's just based on a factual mistake. And E is still the controlling Supreme Court precedent there. Okay. Thank you, Mr. Yale. Mr. Manigat, you've got a couple minutes. Thank you, Judge Fink. Your Honors, I'd like to respond to just a couple of things. First of all, Youngstown Steel says nothing about this. That was a presidential order. So it was not rooted in any congressional action. And it was an injunction case. They weren't addressing the takings issue. There was some mention of taking. But the issue was whether a presidential order by itself without congressional authorization was legitimate or not. So it says nothing about this. Very briefly, E was absolutely a rent control case. In fact, the court in E says this would be a different case if there had been a prohibition on evicting tenants who did not pay rent. There was no challenge to the underlying California statute that put limits on transfers. It was simply an argument based on what an economist would term rent, and that is who got the value, the increased value of the pad, if you couldn't, if the landlord could not refuse a sale of the mobile home to another tenant. The issues here are very different. Can I ask you just a clean-up housekeeping question? Of course. Just that you – I'm not going to raise the illegal exaction thing. We didn't have that. But just that you raised that as an alternative. Just as a process matter, if one were to hypothetically agree with you on the takings claim, is it your view that we don't – do you agree that we would need to reach the illegal exaction? If you agree with us on the takings claim, we need not reach the illegal exaction. And also, you're not – you're pressing this exclusively as a physical taking. Yes, sir. That is correct. So just, you know, whereas Cedar Point is exactly the case here, the court in spades goes over and over and says, if you have people who are not authorized to enter the property and the government appropriates the right to exclude, that is a per se physical taking. The people we are talking about here are not renters. They are not authorized. They are former renters. But when they ceased making the rental payments, they were subject to eviction. So that puts them in a very different class. The government would like to say, oh, these people are invitees. They are not invitees. They were at one time. They stopped paying rent. They are no longer invitees. To sum up, Your Honors, the rule that the government would suggest here leads to this perverse consequence. It means that the government, contrary to what the founding fathers had in mind, if the government deliberately goes beyond its authority to take action and takes property, that there is no recompense. All right? The only response the government has is, well, you could seek an injunction. And we know how well that worked here because there was an attempt at an injunction. And the government, despite now saying, oh, there's no statutory authority, took for a year, fought tooth and nail, and so for the entire period that this order was in effect, you had people living on premise, not paying rent, and the landlords incurring the cost. That is not what the government should have. We're out of time. Thank you. Thank you, Your Honors. I appreciate it. I appreciate the basis of that.